IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 3:17-CR-123 |
| | ) | Hon. John A. Gibney, Jr. |
| CASEY CHARLES SPAIN, | ) | |
| | ) | |
| *Defendant.* | ) | Sentencing: February 12, 2018 |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND MOTION FOR AN UPWARD VARIANT SENTENCE

*The FBI received information . . . that, while incarcerated, Spain became radicalized and expressed a desire to engage in acts of violence.  Additionally, the FBI received information that Spain swore a pledge of loyalty, commonly known as bayat, to Abu Bakr al-Baghdadi, the leader of the Islamic State of Iraq and al-Sham ("ISIS"), a designated Foreign Terrorist Organization.  Spain also obtained a tattoo of the ISIS flag on his back.*

> *November 3, 2017 Statement of Facts, signed by Casey Spain*

*"I was watching a jank, right?  They took the dude, right?  And stuck his, stuck his head in a fish tank, bro . . . That was how they finished him off bro . . . That jank funny bro."*

> *August 27, 2017, Casey Spain's recorded phone conversation in which he discusses an ISIS video depicting execution-style murders*

*"For real I been trying to figure out how I can make hijrah bro . . . I was just telling my P.O. [Probation Officer], she ain't got no choice.  This where we at right now.  It's real bro.  I ain't trying even to stay here bro.  I dunno if I'm on a no-fly list or not, but that's what I'm on."*

> *August 25, 2017, Casey Spain's recorded phone conversation in which he discusses his desire to join ISIS*

*"[Casey Spain] grabbed me and put his hand over my mouth and said don't scream I have a gun, and he took me down the street and bit my face and took me to the ditch then he laid me down and said that he was just going to [defile] me and I said no and he told me not to scream again and stuck his hand in my mouth . . . ."*

> *June 5, 2010 victim statement from a 15-year-old girl who Casey Spain admitted he abducted with the intent to defile*

The United States of America, by and through its attorneys, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual § 6A1.2, files this Position of the United States with Respect to Sentencing and Motion for an Upward Variant Sentence for Casey Charles Spain ("the defendant" or "Spain").  The government has reviewed the Presentence Investigation Report and has no objection to it.  For the reasons set forth below, the government submits that a statutory maximum sentence of **120 months** would be sufficient and not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a).

## I.    INTRODUCTION

Casey Spain's thirst for extreme violence, his longstanding proclivity to ignore and violate the rule of law, and the need to protect the public have earned him a statutory maximum sentence 10 years' imprisonment in this case.  The quantum of evidence gathered during this investigation shows that the defendant's conduct is not simply a 24-hour window of catastrophically poor judgment or behavior reflecting impulsive, spur-of-the moment decisions. Rather, the defendant's conduct, much like the "cop killa" tattoo brandished across his face, is emblematic of lawlessness and arrogance, displays his propensity for violence, and demonstrates that he acted deliberately and consciously to acquire a semiautomatic firearm less than three weeks after he served over seven years in prison.  During the 20 days that he was on supervised probation before committing the instant offense, the defendant also violated numerous probation conditions and actively sought to heed the jihadist siren song.

While the defendant's efforts to join ISIS and offer himself as a *mujahid* (fighter) to the most lethal terrorist organization in the world were successfully thwarted by the FBI, the defendant's criminal conduct in this case and his extensive criminal history are chilling, and he poses a significant threat to the public safety of the United States.  The government submits that,

following a conscientious consideration of the sentencing factors set forth in 18 U.S.C.

§ 3553(a), an upward variant sentence is warranted in this case.  A statutory maximum sentence

of 120 months appropriately measures the severity of the defendant's aggravated criminal

conduct, and is necessary to protect the safety of the community.

## II.     OFFENSE CONDUCT[1]

On August 11, 2017, the defendant, Casey Charles Spain, a 28-year-old United States

citizen, was released from the Virginia Department of Corrections after serving over seven years

of incarceration.  The defendant's sentence followed his conviction in the Henrico County

Circuit Court, Virginia, for abduction with intent to defile.  Upon his release from state prison,

Spain commenced a term of supervised probation during which he was monitored by a Virginia

state probation officer.  As a convicted felon, the defendant was prohibited from owning,

possessing or transporting firearms.

The FBI received information from officials and individuals within the Virginia

Department of Corrections indicating that, while incarcerated, the defendant became radicalized

and expressed a desire to engage in acts of violence.  Additionally, the FBI received information

that the defendant swore a pledge of loyalty, commonly known as *bayat*, to Abu Bakr al-

Baghdadi, the leader of ISIS, which has been designated as a Foreign Terrorist Organization by

the United States government.  The defendant also obtained a large tattoo of the ISIS flag on his

back, as depicted in the following photograph:

---

[1] The conduct described in this section is consistent with the agreed-upon Statement of Facts between the parties that was signed and filed on November 3, 2017, in connection with the defendant's guilty plea.  *See* ECF No. 18.  However, the agreed-upon Statement of Facts explicitly noted that "[i]t does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case."  *Id.* at 8.  Additional facts surrounding the defendant's serious and egregious conduct are set forth below.



Because of this and other information described below, the FBI began conducting surveillance of the defendant immediately upon his release from state prison.  This surveillance included making covert contact with the defendant using FBI undercover employees ("UCE"), as well as the use of a confidential human source ("CHS"), who was introduced to the defendant on or about August 19, 2017.  Following their introduction, the defendant spoke on multiple occasions to the CHS and UCEs about his strong desire to obtain a firearm.  On August 30, 2017, for example, the defendant described to the CHS his intention to purchase a 9 mm semiautomatic handgun with a 50-round barrel canister, and that he had made arrangements to buy the firearm from an individual online.  The defendant also showed his smartphone to a UCE to share parts of his conversation with the reported seller of another firearm, and showed a picture of a handgun with multiple magazines, which the defendant intended to purchase from the seller.

Because of the defendant's criminal history, his stated intentions (see *infra*), and the impatience he exhibited with regard to obtaining a gun, the CHS – as part of a controlled FBI undercover operation – offered to provide the defendant with what the CHS described as his own personal weapon.  In fact, the weapon was a government owned 9 mm Glock, Model 26, semiautomatic pistol, with its serial number plate removed, that the FBI used in undercover operations.

In the early morning hours of August 31, 2017, as part of the undercover operation, the CHS and a UCE met the defendant outside of his residence.  At that meeting, the CHS provided the defendant the above-described firearm, and the defendant was subsequently arrested by the FBI Richmond SWAT members.  The defendant initially attempted to flee and escape arrest by running and jumping a nearby fence, but FBI SWAT members pursued the defendant on foot and quickly apprehended him.  The agents also recovered a mobile phone and the above-described firearm.  The defendant had discarded the mobile phone during the foot-chase and had thrown the firearm over the fence that he was attempting to climb moments before his arrest.

## III.    STANDARDS GOVERNING SENTENCING

The standards governing sentencing are well established.  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the United States Sentencing Commission, Guidelines Manual ("USSG" or the "Guidelines") purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  *Id.* at 264; *see also United States v. Kimbrough*, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

That the Guidelines are non-binding, however, does not render them irrelevant to the imposition of an appropriate sentence.  In *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.  *Id.* at 596-97.  The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance

sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Moreover, it is undisputed that at a sentencing hearing, the court may consider a "broad scope of information." *United States v. Falesbork*, 5 F.3d 715, 722 (4th Cir. 1993). This broad view as to the admissibility of evidence during sentencing is mandated in 18 U.S.C. § 3661, which states, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Powell*, 650 F.3d 388, 392 (4th Cir. 2011) ("We too have repeatedly allowed a sentencing court to consider 'any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'") (citations omitted); USSG § 6A1.3(a) (stating that the only evidentiary limitation upon a sentencing court is that the evidence must be relevant and have "sufficient indicia of reliability to support its probable accuracy."); Fed. R. Evid. 1001(d)(3) (exempting sentencing proceedings from the Federal Rules of Evidence).

## IV.   SENTENCING GUIDELINES

The government agrees with the United States Probation Office's Guidelines calculation set forth in its Presentence Investigation Report ("PSR").[2] Because the defendant timely notified

---

[2] References to the PSR are based on the government's review of the initial PSR and discussions with the PSR's author, both of which indicate that the final PSR submitted to the Court will not differ materially from the initial PSR, other than noting a defense objection to the application of a four-level enhancement pursuant to USSG § 2K2.1(b)(4). The government has addressed the defense's objection below. To comply with the Court's Sentencing Guideline Order, the United States has filed its Sentencing Position prior to receipt of the final PSR. Upon receipt of the final PSR, the government will conduct a review, and if there any changes that have an impact on the

the United States of his intention to plead guilty, the government moves this Court, pursuant to USSG § 3E1.1(b), to grant the defendant an additional one-level reduction in the offense level for acceptance of responsibility.  Factoring in that one-level reduction, the Probation Office has determined that the defendant's total offense level is 23 and a Criminal History Category of IV, resulting in an advisory Guidelines range of 70-87 months in prison.[3]  PSR ¶¶ 36-37; 86-87.

The government also concurs with the Probation Office that the four-level enhancement set forth in USSG § 2K2.1(b)(4) applies given that the defendant possessed a firearm with its serial number plate removed.  *Id.* ¶ 29.  As the Fourth Circuit recognized in an unpublished decision, "under the Guidelines' commentary, there is no requirement that he have any knowledge, or reason to believe, the gun had an altered [or obliterated] serial number."  *United States v. Bowers*, 616 F. App'x 620, 622 (4th Cir. 2015).  *See also United States v. James*, 643 F. App'x 836, 837–38 (11th Cir. 2016) ("[W]e have found no cases in which this Court, the United States Supreme Court, or another circuit court has interpreted the enhancement to require an intentional act.; *United States v. Miller*, 529 F. App'x 331, 335 (4th Cir. 2013) ("This contention is meritless . . . . and the Guidelines specifically indicate that knowledge of the obliterated serial

---

government's sentencing position, those changes will be promptly brought to the attention of the Court.

[3] The government notes that the Probation Office has correctly identified, pursuant to USSG § 4A1.3(a), the defendant's inadequacy of Criminal History Category and the likelihood that he will commit other crimes (*see* PSR ¶ 88), as well as the defendant's aggravated conduct, pursuant to USSG §5K2.0(a)(1)(A), involving his desire and efforts to seek opportunities to travel overseas and join ISIS, much of which occurred during the same 20-day period in August 2017 while he was on supervised probation and during which he sought to obtain a firearm (*Id.* ¶¶ 10-14 and 19-20), as factors that may warrant an upward departure from the Guidelines.  The government is casting its motion as one for variance, however, because, in addition to those factors, particular considerations about the nature and seriousness of the offense, the history and characteristics of the defendant, the need to deter future criminal conduct, the need to protect the public, and other factors under 18 U.S.C. § 3553(a) encourage a higher sentence than called for in the applicable advisory Guidelines range.

number is not required."); *United States v. Perez*, 585 F.3d 880, 883 (5th Cir. 2009) ("This court has continually enforced the clear and unambiguous language of § 2K2.1(b)(4) and its strict liability standard."); *United States v. Statham*, 581 F.3d 548, 553 (7th Cir. 2009) ("[The defendant] need not have known that serial numbers had been removed from the weapons."); *United States v. Brown*, 514 F.3d 256, 269 (2d Cir. 2008) (holding that § 2K2.1(b)(4) is a strict liability enhancement provision).

Nonetheless, the defendant seeks to contrast USSG § 2K2.1(b)(4), which applies a sentencing enhancement to a felon-in-possession conviction where a firearm has an "altered or obliterated serial number," with 18 U.S.C. § 922(k), which criminalizes activity relating to a firearm that has had its "importer's or manufacturer's serial number removed, obliterated, or altered." Because USSG § 2K2.1(b)(4) does not include the term "removed," the defendant claims that the enhancement only applies where a firearm's serial number has been obliterated or altered, but not where a firearm's serial number has been removed. Such an argument is incorrect, and there does not appear to be any case law or other authority to support it.

The plain meaning of "removed" and "obliterated" indicate that the words may be used interchangeably. In fact, this precise issue was raised and litigated in the Ninth Circuit, where the Court held that a serial number on firearm that had been removed or erased satisfied definition of "obliterated" for purposes of USSG § 2K2.1(b)(4). *See United States v. Romero-Martinez*, 443 F.3d 1185, 1189 (9th Cir. 2006). In doing so, the Court stated the following:

> Black's Law Dictionary defines "obliterate" as "to *remove* from existence; to destroy all traces of." Black's Law Dictionary 1106 (8th ed.2004) (emphasis added). Webster's Third New International Dictionary includes a number of definitions for obliterate, several of which contain "remove." *See* Webster's Third New International Dictionary 1557 (1981) (defining "obliterate" as "1: to *remove* from significance and bring to nothingness: … b: to *remove* utterly from recognition ... c(1): to *remove* from existence ... (2) to cause to disappear ... *remove*. ...") (emphasis added). The American Heritage Dictionary, upon which

> [the defendant] places great weight, defines "obliterate" as "[t]o do away with completely so as to leave no trace."  American Heritage Dictionary of the English Language 1248 (3d ed.1992).  Although this definition does not directly use "remove," it is clear that "removed completely," the language used in the jury instructions, meets this definition.

The Court concluded, therefore, that "all of these dictionaries support inclusion of 'removed completely' within the definition of 'obliterated.'"  Courts of appeals have also treated the words "remove" and "obliterate" as synonyms.  *See, e.g.*, *United States v. Statham*, 581 F.3d 548, 553 (7th Cir. 2009) ("[The defendant] need not have known that serial numbers had been removed from the weapons."); *United States v. Settle*, 394 F.3d 422, 435 (6th Cir. 2005) (discussing removal of serial numbers in context of USSG § 2K2.1 (b)(4)), *remanded on other grounds*, 125 S. Ct. 2560 (June 6, 2005); *United States v. Roxborough*, 99 F.3d 212, 213 (6th Cir. 1996) (discussing "removing" of serial numbers in context of "obliteration enhancement"); *United States v. Sasso*, 59 F.3d 341, 346, 353 (2d Cir. 1995) (finding application of enhancement appropriate where the serial numbers had been "removed").

While the enhancement clearly applies in this instance, the Court can and should take into consideration, when analyzing the 18 U.S.C. § 3553(a) factors, that the defendant did not seek the removal of the serial number before he sought or obtained the firearm at issue.  Even such an allowance, however, should not deter the Court from imposing a sentence on the defendant that is anything less than the statutory maximum.

## V.   A SENTENCE OF 10 YEARS' IMPRISONMENT IS WARRANTED BASED UPON ALL OF THE 18 U.S.C. SECTION 3553(a) FACTORS

After calculating the appropriate advisory Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors."  *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  Title 18, United States Code, Section 3553(a)(1) provides

that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

If the court determines that the sentence recommended by the Guidelines does not sufficiently serve the § 3553(a) factors, it must "select a sentence that does serve those factors." *United States v. Green*, 436 F.3d 449, 455-56 (4th Cir. 2006). Following the guidance of the Supreme Court in *Gall*, an individualized assessment of the defendant's background, character, and criminal behavior establishes that the advisory Guidelines range in this case is insufficient to accomplish the goals of § 3553(a). An upward variant sentence of 10 years' imprisonment reflects the seriousness of the offense, the critical need to deter this type of conduct, and appropriately captures the severity of the defendant's conduct and the danger he poses to the community.

### A.     A Statutory Maximum Sentence Serves the Factors of § 3553(a)(1)

#### 1.   Nature and Circumstances of the Offense

The nature and circumstances of the defendant's conviction are arguably far more ominous and menacing than the cadre of felons who have been sentenced for possessing a semiautomatic firearm capable of accepting a large capacity magazine. This defendant is a dangerous and volatile individual who is radicalized towards violent *jihad*.[4]  Following his

---

[4] While the word "*jihad*" itself means "struggle," it is commonly understood by extremists, to include ISIS supporters such as the defendant, to also mean a violent holy war.

release from prison on August 11, 2017, the defendant discussed with still-incarcerated prisoners his desire to travel overseas and join ISIS.  The following excerpts are examples of some of those conversations, all of which transpired on recorded jail calls:[5]

- On August 21, 2017, the defendant claimed that, three days following his release from state prison, he logged on Facebook (a clear violation of the terms and conditions of his state probation) and spoke with a "brother in Raqqa"[6] who said "that it is wicked out there bro."  The defendant made additional statements about ISIS' presence in the Philippines, indicating that "they took the whole south," and that "Afghanistan is all on the *khilafa*[7] too."

- Also on August 21, 2017, the defendant bragged to an inmate about beating up corrections officers at the Greensville Correctional Center located in Jarratt, Virginia.  During the conversation, when the inmate said that he heard the defendant was "down there wilding" (a reference to fighting), the defendant responded, "that's what we do to *kufr*[8] . . . . the *khilafa* says, 'terrorize them.'"

- On August 25, 2017, the defendant stated, in sum and substance, "for real, for real I been trying to figure out how I can make *hijrah*[9] bro . . . . I was just telling my P.O. [a reference to the defendant's probation officer], she ain't got no choice.  This where we at right now.  It's real bro.  I ain't tryin' even to stay here bro.  I dunno if I'm on a no-fly list or not, but that's what I'm on."

- On August 26, 2017, the defendant reiterated that he's "gonna make *hijrah*

---

[5] These summaries are not intended to be verbatim transcripts of the recorded calls, and are set forth in this sentencing memorandum to reflect a potentially limited subset of statements that the defendant has made, in sum and substance, regarding his desire to travel overseas and join ISIS since his release from state prison.  *See* PSR ¶ 11.

[6] This is a reference to "al-Raqqa," which is a city in Northern Syria where ISIS had made its headquarters in Syria.  When the defendant was making these statements and purportedly speaking to a "brother" (or ISIS member) located there, forces were battling ISIS in al-Raqqa to retake control of the city from the terrorist organization.

[7] ISIS commonly uses the term "*khilafa*" to refer to their purported Islamic state, or caliphate.

[8] "*Kufr*" is a pejorative term alluding to a person who rejects or does not believe in God, as often defined by ISIS.

[9] *Hijrah* means emigration, but in the context of someone who wishes to travel to join ISIS, that term refers to the migration to the caliphate and is often used as a cover term for ISIS recruiters to recruit foreign fighters.

*inshallah*.[10]"  When the inmate asked him if he's going to stay "there" (presumably, a reference to the caliphate), the defendant replied, "yeah, you know once you go you can't come back."  The inmate agreed with the defendant and said that at that point, "you're locked in," to which the defendant replied, "yeah, *Alhamdulillah*.[11]  That's the ultimate goal anyways."

- On August 27, 2017, the defendant discussed the ISIS flag tattoo on his back and told an inmate, "I put this jank on Facebook right, and all the people overseas was like, "Oh Shit" . . . . It feels *haram* (*i.e.,* "forbidden"), but they was like it was a nice image though.  That's what the brothers said in the khalifa.  That's how I got banned from Facebook . . . . I been kickin' it with a brother, he on that type time too.  We don't even rock with anybody else, you know what I mean."  During the same conversation, the defendant stated yet again that he's "trying to make *hijrah*."

- Also on August 27, 2017, the defendant stated that, although he has been told otherwise, he "might be on a no-fly list," and indicated that he was researching what a "selective interrogation" list is, and learned that "they" (presumably, U.S. Customs and Border Protection) "going to pull you aside [and ask] like, "what are you doing?"  The defendant subsequently stated that "it don't matter though" because he researched freight liners, such as big cargo ships, learned that it would cost him around $800 to "get on them," and informed the inmate that he "was just looking at Mexico bro," because the defendant "can go through there with no passport," according to his research "about an hour ago."

- Furthermore, on that same day, the defendant told the inmate that "the other day" he "was watching a jank" that involved an individual who had his head stuck in a fish tank and "that was how they finished him off bro."  The defendant appears to be referring to a propaganda video that was publicly released on the Internet by ISIS on or about January 3, 2017, entitled "The Procession of Light," which depicts several executions of ISIS prisoners, one of which involved a prisoner who is filmed being drowned in a large glass tank full of water.[12]  During the call,

---

[10] *Inshallah* is an Arabic expression meaning, "If Allah wills it."

[11] *Alhamdulillah* is an Arabic expression meaning, "Praise be to Allah."

[12] The Procession of Light ISIS video is approximately 42 minutes long in total and contains numerous scenes of suicide bombings, with depictions of the bombers preparing themselves for their suicide attacks along with apparent overhead drone footage capturing the explosions.  The last approximate six minutes of the video show a rooftop beheading of one prisoner, followed by the drowning of a second prisoner in a tank of water.  The drowning scene starts with a man dressed in an orange jump suit facing a large glass tank.  His eyes widen as the tank is filled with water in front of him.  The man's arms appear to be restrained behind his back and as someone forces his head underwater.  Air bubbles escape from his mouth.  The unseen person pulls the man's head out of the water before he loses consciousness.  A bottle of what appears to be an

the defendant laughed when discussing the video and stated, "that jank funny bro."

Information from the defendant's Facebook account further revealed that, within days of being released from prison on August 11, 2017, Spain was using a newly established account (which was registered using his email address, cell phone number, and nom de guerre) to speak with individuals about ISIS and his desire to engage in *jihad*. In his profile, the defendant made it falsely appear as though he was located in Raqqa, Syria, which was then-ISIS controlled territory (presumably, to continue his conversations with individuals affiliated with ISIS and/or to bolster his ISIS bonafides and draw interest from like-minded individuals).

On August 13, 2017, the defendant asked whether an individual on Facebook "know[s] how I can contact any fighters?" For the next few days, Spain used Google to translate Facebook messages from English to Indonesian in order to converse with individuals about ISIS. The defendant also used his Facebook account to post a picture of the ISIS flag that is tattooed on his back on August 14, 2017, which is the same date that the defendant contacted an individual through Facebook who claimed to be from Indonesia seeking information about "*dawla islamiya*," a term that refers to ISIS. The defendant asked that same individual whether he is a "*mujahid*," which, in the context of this investigation, refers to an individual engaged in *jihad* or an ISIS fighter. The defendant also sent messages that he translated from English to Indonesian to another individual, to include: "I wish to be a warrior"; "I'm looking for warriors to speak with"; "[D]o you fight the devil America?" and "If you had a warrior here would it help?" These messages, viewed in conjunction with the other evidence in this case, demonstrate the defendant's desire to serve and fight on behalf of ISIS, both overseas and domestically.

---

alcoholic beverage is poured into the tank and the man's head is again forced underwater. His eyes bulge and he is held under water until he appears to be dead.

In another conversation on Facebook, the defendant asked the individual "[w]ho do you fight for," the individual responded that he is fighting "for the *khilafa* [referring to ISIS' caliphate] to be erect in the country."  In a separate conversation with an individual who told the defendant he/she is in Manila (referring to the Philippines), the defendant stated that he is "looking to be a *mujahid*."  Another individual on Facebook sent the defendant what appears to be an image of ISIS-controlled territory in Syria and Iraq, and an image of what appears to be armed fighters with ISIS flags riding on tanks.

    2.  <u>History and Characteristics of the Defendant</u>

*i. The Defendant's Serious and Violent Criminal History*

This defendant has been committing crimes, many of which have been violent, since he was 13-years-old.  He has exhibited a long-standing proclivity to ignore and violate the law.  His criminal history spans over a 15-year period – demonstrating that prior penalties and court intervention have done nothing to deter the defendant from criminal behavior.  Perhaps most concerning is that the defendant's criminal conduct has become increasingly violent as he has grown older.

In 2006, the defendant engaged in a crime spree and was convicted of statutory burglary, possession of a sawed-off shotgun, and malicious wounding, all of which stemmed from incidents that were just a few days apart.  PSR ¶¶ 44-46.  Spain's malicious wounding conviction resulted from his reckless decision to stab an individual, who was unarmed and with his hands at his side, with a sword.  *Id.* ¶ 44.  This stabbing, like many other offenses in his disturbing criminal history, appears to have been impulsive and gratuitous, provoked as it were by the defendant's attempt to attend a party to which he was not invited.  *Id.*  Similar to his offense conduct here, the defendant took off running after he committed his crime.  *Id.*

14

In 2008, approximately two months after the defendant was released from prison, he was arrested for attempting to elude police, an offense of which he was subsequently convicted. *Id.* ¶ 47.

In 2010, the defendant was convicted of abduction with intent to defile. *Id.* ¶ 48. The egregious facts of the crime and the victim's chilling words demonstrate the callous nature of the defendant's actions. In that case, at approximately 2:45 a.m., the defendant entered the home of a 15-year-old victim, uninvited, and woke her up. *Id.* The defendant and the victim had a discussion, and the defendant asked the victim where another street was located. *Id.* The victim walked the defendant to the door and pointed to the street. *Id.* As written by the victim, the defendant then "grabbed me and put his hand over my mouth and said *don't scream I have a gun*, and he took me down the street and *bit my face and took me to the ditch* then he laid me down and *said that he was just going to fuck me* and I said no and he told me not to scream again and stuck his hand in my mouth . . . ." Gov. Ex. 1 (emphasis added). Fortunately, the victim managed to escape by kicking the defendant just before he intended to rape her. *Id.*

The defendant's history of recidivism is compounded by the fact that he cannot even control himself in prison given his propensity to disregard rules and authority. While he was incarcerated from 2010 through 2017, the defendant committed the following disciplinary offenses: aggravated assault upon an offender; multiple possession of contraband offenses; stealing, intentionally destroy/altering/damaging State or any property; making sexual advances/physical/verbal in nature toward non-offender, and false statements or charges against an employee; tattooing/piercing/branding of self or others/possession of tattoo equipment; and disobeying an order. PSR ¶ 48.

In 2017, a mere 20 days after the defendant served over seven years in state prison for the above-described abduction with intent to defile conviction involving a 15-year-old girl, the defendant committed the instant offense while on supervised probation.  When the defendant was released on August 11, 2017, he reported to his probation officer, who explained a number of release conditions to which the defendant agreed to abide by.  Nonetheless, the defendant immediately began violating several of those conditions, to include:

- *Sex Offender Instruction Prohibiting Contact with Minors (see* Gov. Ex. 2, Instruction #4): Law enforcement surveillance teams observed the defendant with his sister and her two juvenile children visiting various stores and businesses within hours of the defendant leaving the probation officer's office.  (It was not until a few weeks later that his probation officer decided to allow him to have contact with his niece and nephew.)

- *Probation Officer Instruction Prohibiting the Purchase of a Smartphone*: The defendant's probation officer informed him that he could have a cell phone, but not a "smartphone."  The defendant told his probation officer that he would wait until he had permission to obtain a smartphone.  However, the defendant purchased a pre-paid smartphone within hours of being released from prison.  According to information received by the FBI, the defendant registered the phone under "Robert Jenkins," which is a fake name.

- *Sex Offender Instruction Prohibiting the use of Social Media, including Facebook* (*Id.* at Instruction #6)*:* The defendant created several Facebook accounts shortly after being released from prison to communicate with individuals about his desire to serve ISIS and become a fighter.

- *Sex Offender Instruction Prohibiting the use of Internet Services* (*Id.* at Instruction #7): Shortly after his release from prison, the defendant purchased a smart phone, used an email account to communicate with inmates in the Virginia Department of Corrections, and used the Internet to create Facebook accounts.

- *Sex Offender Instruction Requiring Employment to be Approved by Probation:* (*Id.* at Instruction #8): Within several days of his release, the defendant began working six days a week at a dry cleaning business.  He did not report his employment to his probation officer, and bragged to an inmate in the Virginia Department of Corrections about hiding his job from her.

Taken as a whole, this criminal history clearly demonstrates that the defendant has a complete disregard for the law and the authority of the Court.  Against this backdrop, the notion

that the defendant will recidivate, and recidivate badly, when released to the community should not be subject to serious dispute.

### ii. Characteristics of the Defendant, Including His Path to Radicalization

As noted above, the FBI received information from officials and individuals within the Virginia Department of Corrections indicating that, while incarcerated, the defendant became radicalized and expressed a desire to engage in acts of violence. PSR ¶ 2. In addition to obtaining a tattoo of the ISIS flag on his back, the defendant previously obtained tattoos of, *inter alia*, "cop killa" on his right cheek; "Insane" on the left side of his neck; a machine gun that spans the length of his torso; and underneath the coy fish and scroll pattern on his right leg are the words "Death to," which, until covered over, was a companion tattoo for the "America" tattoo on his left leg. *See id.* ¶ 73; Gov. Exs. 3-4.

As early as 2011, while incarcerated in state prison, the defendant sent a letter to a family member asking that individual to print out copies of "Inspire Magazine" (published by al-Qaeda, a designated Foreign Terrorist Organization) and send them to him. PSR ¶ 8. The defendant later sent a letter to the same family member, informing the individual that he ordered "that magazine" himself and that the individual did not need to worry about it. *Id.* In a 2014 prison letter, Spain again asked the family member to send him "Inspire magazine" and the "Islamic State Magazine." *Id.*

Two confidential sources of information, identified herein as Prison Source 1 and Prison Source 2,[13] separately reported that the defendant swore a pledge of loyalty, commonly known as *bayat*, to Abu Bakr al-Baghdadi, the leader of ISIS. *Id.* ¶ 9. The defendant also told Prison

---

[13] Pertinent information relating to the backgrounds and criminal histories of Prison Source 1 and Prison Source 2 was provided to the U.S. Probation Office and is included in the PSR. *Id.* ¶ 9, nn.1-2.

Source 2, as well as the CHS,[14] that he wanted to travel overseas to engage in *jihad* on behalf of ISIS, and if upon his release he were not permitted to travel he would engage in *jihad*, to include acts of violence against targets in the United States.  *Id.*

On or about December 2, 2016, Prison Source 1 provided information that the defendant is also known as "Umar Abdul al-Haqq" or "Umar Abdul al-Haq," which the FBI believes is the defendant's *kunya*.[15]  *Id.* ¶ 10.  On that same date, Prison Source 1 reported that the defendant also previously stated that he felt his internal jihad was complete and was obsessed with the external jihad.  *Id.*  According to this source, the defendant was fixated on attacking a target such as the Marine Corps Base in Quantico, Virginia, and was excited about potentially attacking unidentified police stations, as well as an unidentified armory in Richmond, Virginia.  *Id.*  The same source also stated that the defendant was excited about the idea of potentially attacking targets of this nature due to the large effects it would produce.  *Id.*  The defendant told Prison Source 1 that he planned to conduct a one-man active shooter attack on an unidentified date, and planned to die during the attack while shooting.  *Id.*

Instead of acknowledging the dangerousness of his actions, the defendant attempts to minimize his responsibility by focusing on the neighborhood in which he resided and his upbringing and as being somehow responsible for the abhorrent conduct in which he has engaged.  *Id.* ¶¶ 25, 59-60.  While the government acknowledges that the defendant may have endured difficult periods in his life during his unfortunate childhood, the government also sees a

[14] The CHS referenced throughout this sentencing memorandum is a paid FBI source who has a lengthy criminal history.  *Id.* ¶ 12, n.11.  His reporting has been corroborated by undercover FBI employees and other individuals, as well as through consensual recordings with the defendant and recorded prison calls with still-incarcerated inmates.

[15] A *kunya* is an Arabic term that refers to an alias or nickname for an individual, and is commonly used by aspiring ISIS members, among others.

picture of the defendant's history and characteristics that illustrates how he squandered opportunities to better himself and, instead, sought out opportunities to repeatedly return to a life of increasingly violent crime.  It was the defendant's choice, and his choice alone, to pursue efforts to obtain a firearm while simultaneously seeking to join the deadliest terrorist organization on the face of the planet less than three weeks after serving a lengthy prison sentence.  The defendant's level of vitriol, volatility, and attraction to violent *jihad* call out for a substantial sentence in order to punish and incapacitate him, and to protect the public.

**B.    A Statutory Maximum Sentence Serves the Factors of § 3553(a)(2)**

1.   <u>Seriousness of the Offense</u>

The serious of the offense and the defendant's actions, as described above, is beyond dispute.  After serving over seven years in state prison following his convictions for abducting and attempting to rape a 15-year-old girl, the defendant sought to procure a firearm in connection with his plan to join a vicious terrorist organization that has brutally murdered thousands of victims around the globe.

The CHS reported that the defendant, over multiple conversations, provided several reasons for wanting to obtain a handgun.  First, Spain indicated that he felt naked and vulnerable without one.  PSR ¶ 14.  Second, the defendant stated that if "three or more" law enforcement officers came to his home then he "knew what time it was," or words to that effect, and that he would kill as many officers as he could rather than go back to prison.  *Id.*  Third, and related to the second point, the defendant stated that going back to prison was not part of his plan, which the CHS understood to mean would interfere with Spain's plan to engage in activities in support of ISIS.  *Id.*  Fourth, the defendant advised the CHS that if he (the defendant) could not travel overseas to fight on behalf of ISIS, he would "do something here," and that he was trying to be a

martyr and die in *jihad*.  During a meeting with the government following the defendant's arrest, the CHS indicated that the defendant stated that his plan was to travel to Afghanistan, and that if he was turned away while attempting to board his flight, he would use the gun he was seeking to carry out an attack at the airport.

The fact that the defendant sought a firearm from an individual he met just days earlier demonstrates that he will not only break the law, but will use others to circumvent the law to obtain weapons.  As demonstrated by the defendant's conduct, history of violence, and stated intentions, a firearm in this defendant's hands is patently dangerous.  The impulsivity and violence of the defendant's actions and words over the years strongly support the conclusion that the defendant's statements were not mere puffery or idle chatter.  But for the FBI's successful undercover operation, the defendant's intended actions if brought to fruition – to include acts of violence against targets in the United States, such as the Marine Corps Base in Quantico, Virginia and an unidentified armory in Richmond, Virginia – would have been devastating, potentially leading to the loss of numerous innocent lives.

### 2.   Need to Deter Future Criminal Conduct

Imposing a guideline range sentence will not provide adequate deterrence for this defendant, judging from contiguous criminal conduct, repeated contempt for the judicial system, and the arrogant nature with which he committed the offense.  If this court imposes a Guidelines sentence, there is no reason to believe this defendant will be deterred from future crime.  To the contrary, this defendant may see it as another tepid punishment for his actions.  Indeed, one wonders if anything short of incapacitation until he has reached a very old age would provide sufficient deterrence for the defendant.  This Court should impose an upward variant sentence

that communicates to the defendant and to the public that the only sentence that would approach the deterrent effect necessary in this case would be the statutory maximum of 120 months.

The importance of the rule of law cannot be overstated. A substantial sentence in this case would also send an appropriate and much needed message to all persons harboring any illusory notion that seeking to serve or fight on behalf of ISIS in any manner is in any way meaningful and worth the risk. It is repulsive conduct, even if it does not rise to the level of an attempted or completed terrorism offense. Further, with the spread of the poisonous ideology into the Internet and social media, the jihadist philosophy shows no sign of abating. Strong punishments for this conduct would send the appropriate message to others that violating firearms offenses and having terrorism-related aspirations will be pursued aggressively, and those who violate the law in this manner will be punished accordingly.

3. <u>Need to Protect the Public from the Defendant's Future Criminal Conduct</u>

The defendant has a long history of victimizing those around him, from the individual that he stabbed with a sword, to the 15-year-old girl who he abducted with the intent to defile, to the residents of the communities that he has terrorized due to his impulsive and capricious behavior. The defendant's criminal history is replete with criminal convictions that demonstrate a serious threat of violence and detriment to the public from which the court should, first and foremost, endeavor to protect. This is a defendant who was excited about the idea of potentially attacking large-scale targets in the United States. PSR ¶ 10. This same defendant once told a prison inmate that he planned to conduct a one-man active shooter attack, and planned to die during the attack while shooting. *Id.*

The fact that the defendant sought to join a terrorist organization, known for its brutality and murderous agenda, within days of his release following a lengthy state prison sentence,

counsels in favor of incapacitating him for as long as possible.  For every month the defendant is incarcerated, the public will be given that much more protection from future crimes by him. Keeping the public's interest in mind, there should be no reduction of that protection by sentencing the defendant to anything less than the statutory maximum.

4.   <u>Need to Provide Treatment to Defendant</u>

The defendant reports no history of psychological or psychiatric treatment, and the Probation Office indicates that there is no documented evidence to suggest otherwise.  PSR ¶ 75. However, at least one of the defendant's family members believes that he is in need of mental or emotional health counseling.  *Id.*  The defendant claims that he has not used any alcohol or drugs since he was 21.  *Id.* ¶ 76.  Nonetheless, given that the defendant reported a history of alcohol or substance abuse and indicated that he has never participated in treatment or counseling, the government recommends that the defendant engage in substance abuse treatment and/or mental health counseling while incarcerated.  *Id.*

The Bureau of Prisons is well equipped to provide treatment for the defendant's physical and mental health needs.  The government believes he can receive such treatment while incarcerated, and does not request that his sentence be extended or reduced in order to accomplish those goals.  Given the defendant's lengthy and serious criminal history, including his probation violations, it would be best to place him in an environment where he could focus on obtaining any necessary treatment without the apparently unavoidable temptation to slice an individual with a sword, abduct a 15-year-old girl with the intent to rape her, possess firearms, discuss plans to engage in large-scale domestic terror attacks that would result in mass casualties, and seek to travel overseas to fight on behalf of terrorist organizations.  His community presence has been nothing short of destructive.

### C.      A Statutory Maximum Sentence Serves the Purpose of § 3553(a)(6)

A statutory maximum sentence for the defendant creates little to no risk for unwarranted sentencing disparities, particularly in light of the defendant's substantial, recidivist criminal history; the nature and circumstances of the offense; the seriousness of the offenses; the need for deterrence; and the need to protect the public from this violent sex offender who aspired to join and fight on behalf of ISIS.

Illustrative of this point is the upward variant statutory maximum sentence imposed less than seven months ago in this district in *United States v. Wehelie*, 1:16-CR-162 (E.D. Va. July 14, 2017) (Lee, J.).  Echoing Spain's case in multiple ways, the FBI's investigation of Wehelie started with evidence showing that he aspired to travel overseas to join ISIS.  *Id.* (ECF No. 48 at 1).  To further the investigation, an undercover FBI employee ("UCE-1") was introduced to Wehelie in December 2015.  *Id.*  Over the course of a few meetings with UCE-1, Wehelie, a convicted felon, expressed a willingness to help UCE-1 move firearms across state lines.  *Id.* at 1-2.  On February 18, 2016, Wehelie did just that by transporting four 9 mm automatic pistols with can-style suppressors and eight 20 round magazines from Maryland into Virginia.  *Id.* at 2.

Defendant Wehelie and UCE-1 watched an ISIS video together, and Wehelie expressed a desire to travel overseas to join ISIS in Libya.  *Id.*  During a March 30, 2016 meeting, UCE-1 asked Wehelie what he would do if he could not travel overseas.  *Id.*  The defendant described how he would go about attacking a United States Armed Forces Recruiting Station.  *Id.* at 2-3.  According to Wehelie, he wanted to cause a lot of damage and "empty the clip."  *Id.* at 3.  Similar to Spain's identification of the Marine Corps Base in Quantico and an unidentified armory in Richmond as some of his potential targets, Wehelie identified a Marine Corps Recruiting Station as an ideal target.  *Id.*

Following the defendant's guilty plea to one count of possessing firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1), the Court sentenced Wehelie to a statutory maximum sentence of 120 months. *See id.* (ECF No. 54 at 2).  In doing so, the Court imposed an upward variant sentence given Wehelie's (uncharged) terrorism-related intentions, and notwithstanding the fact that the Court calculated the total offense level as 19 and a Criminal History Category of II, resulting in an advisory Guidelines range of 33 to 41 months – which is less than half of Spain's advisory Guidelines range. *See id.* (ECF No. 53 at 2).  To paraphrase Judge Lee's remarks during the sentencing hearing, the Court "should have grave concerns about a young man even talking about such a thing [committing a terrorist attack]," and we "should take [the defendant] at [his] word."[16]  The *Wehelie* case demonstrates that a statutory maximum upward variant sentence for defendant Spain is reasonable and appropriate, and avoids an unwarranted disparity with a comparable case.

---

[16] Rachel Weiner, *He talked about committing a terrorist attack.  He'll go to prison for 10 years.*, WASH. POST., July 14, 2017, *available at* https://www.washingtonpost.com/local/public-safety/he-talked-about-committing-a-terrorist-attack-hell-go-to-prison-for-10-years/2017/07/14 dc312e82-67dc-11e7-9928-22d00a47778f_story.html?utm_term=.5a6eca75dca9.

## CONCLUSION

For the foregoing reasons, the government believes that a statutory maximum sentence of 10 years' imprisonment would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By:     _____/s/_____
Raj Parekh
Trial Attorney, Counterterrorism Section
United States Department of Justice
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Phone:   (202) 616-2428
Email:   raj.parekh@usdoj.gov

Brian R. Hood
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone:   (804) 819-5508
Email:   brian.hood@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2018, I filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send an electronic copy to all counsel of

record in this matter.


By:  _____/s/_____
Raj Parekh
Special Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700 (telephone)
(703) 837-8242 (fax)
raj.parekh@usdoj.gov