IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　Case No. 3:17CR123
　　　　　　　　　　　　　　　　　　)
CASEY CHARLES SPAIN　　　　　　 )

**DEFENDANT'S SENTENCING POSITION**

Defendant, by counsel, incorporates by reference his Guideline objection and alternative argument therein separately filed this same day.  He states that he otherwise has no material objections to the presentence report (PSR), agrees that the Guideline range is either 70 to 87 months or 46 to 57 months, depending on this Court's resolution of the objection, and he requests a sentence not exceeding 57 months, on the following grounds.

### *This is a felon in possession of a gun case*

This sentencing concerns a convicted felon who briefly possessed a firearm modified by federal agents in at least two ways he had not sought:  (1) they disabled the weapon from firing in that condition, rendering it "inert," and (2) they removed a metal plate with serial number on it from the weapon.  They also included with the weapon a magazine which could have accepted 17 rounds.  Shortly after their controlled delivery of those items, agents approached  Mr. Spain to arrest him.  He briefly fled, and was "quickly apprehended."  *See* PSR ¶¶ 17-18.

### *This person was forged by abuse, neglect, and mentally ill caretakers*

Many are blessed to be born healthy.  What happens thereafter does not necessarily continue that trend.

1

Casey Charles Spain recently turned 29 years old. *See* PSR ¶ 59. He was an infant when his parents separated, about 5 years old when they formally divorced. PSR ¶¶ 57, 59.

Spain believes he has seen his mother seven times his entire life, and only once in the last 10 years. His father was present more, but often working or with his girlfriends. He sometimes left days, prompting Casey's sister, just two years older, to play caretaker---the one to teach him how to read and help with his homework. PSR ¶ 59.

Spain's father married twice more; neither of his stepmothers are close to him. The first beat him and his sister "pretty bad," causing scars on his chest from being burned. PSR ¶ 60.

***Spain understates the actual scope and impact of his abuse.*** His father told authorities that Casey's mother suffered from bipolar disorder, was hospitalized for mental reasons at least once, and out of Casey's life when he was about two. PSR ¶ 65 (discussing father's statements in 2006 state PSR). His sister describes their biological mother as an alcoholic and drug user who has never been a part of their lives. PSR ¶ 66.

The siblings weren't so lucky to have a quick departing, ensuing stepmother. According to the sister, the woman was "physically, verbally, and mentally abusive." She constantly told Casey "'he was dirty, that boys were dirty.'" PSR ¶ 66. That woman also constantly kept food from them, "to the point where both of them were under weight," and had to steal and beg for food. PSR ¶ 66.

***Spain's father likewise describes his second wife as "abusive to the subject"***---that's what people become after convicted of a crime, "subjects"---over an eight year period from 1991 to 1999, or when Casey ("the subject") went from age two to nine. *Id.* Spain's father thinks his son has a mental disorder and needs help. *Id.*

Leaving his birthplace of Mt. Holly, New Jersey, at age 12, Casey Spain moved to Richmond.  The few, brief respites in his childhood of abuse and neglect appear associated with summers with grandparents in this area, which he and his sister treated "like our summer camp." PSR ¶ 61.

While recognizing some positive aspects of the move to Virginia, Spain's sister hardly describes an adult support system.  She recalls the pair living with their grandmother for almost a year, returning briefly to New Jersey, then moving back to Richmond where their father married a third time.  The third wife was not actively abusive, but "did not provide for them, care for them, cook meals, or help them in any way."  PSR ¶ 67.  The young siblings "still have to fend for themselves," without help from their father, who "'always chose women' over them."  *Id.*

Their second stepmother was also anorexic, and "there was never any food in the house," beyond carrots, soy milk, and ramen noodles, plus the rare take-out food brought home by their father. *Id.*

***Love, attention, and food weren't the only things lacking.***  With bills rarely paid, Casey's sister recalls having about two years without hot water or heat in the house.  "She would ask other people at school for food and money in order to help take care of the defendant and herself."  *Id.*  She left the family home at age 17, about the time Casey suffered his first juvenile detentions.  *Id.*; *see also* PSR ¶¶ 40-42 (noting Casey's detentions at age 15).

### *This person responded predictably in seeking protection when first detained*

Casey Spain recalls converting to the Muslim faith when about 15 years old, detained at the now closed Beaumont Juvenile Correctional Center in a juvenile matter.  PSR ¶ 63. He recalls being "beaten and kicked repeatedly by others at the facility," commencing his second day there.  They fought him over his shoes.  *Id.*  He initially converted for protection, seeing

white Sunni Muslims as the only group to rely on for that in Beaumont, but agrees he later thought more seriously about his faith. He recognizes it as giving him brothership, camaraderie, and faith. *Id.*

Spain's sister states the obvious, in observing that her brother had no guidance, no role model to adopt except perhaps whatever he picked up from his father's involvement in fist fights, and teaching of wrestling. He "likes to fight, likes the attention," and "may have been trying to impress their father." PSR ¶ 69.

> ***This person needs help, but has considered and identified alternative ways to survive, and also has many reasons to survive lawfully, than those this Court may generate***

Like her father, Casey's sister believes her brother needs counseling, specifically for emotional problems and anger issues. In her view, "He is not mature. He was locked up when he was 15. He still acts like he is 15. He can't do simple basic life skills, like banking, and he can't drive." PSR ¶ 70.

She remains supportive of him, and recognizes that he was doing some constructive things in his brief time at liberty between completing his last active prison term in Virginia, and the events that led to this case. These included obtaining employment, applying to take college courses, and contacting his daughter and her grandmother to state he was going to send them some money.[1]

Asked about his future, Mr. Spain said simply if "given another chance," he plans on working and furthering his education. After his release from state custody in August 2017, he

---

[1] Mr. Spain acknowledges he has had little contact with this, his only child, since his 2010 arrest and incarceration. There was in fact a child support order entered in April 2012, however, which is what the defendant wanted to start paying toward. *See* PSR ¶ 62.

4

had plans to eventually open a food cart. He also believed he had enrolled in automotive courses.[2]

Among his prior employment stints are two weeks at a dry cleaner in 2017, four months with a fast food restaurant in 2010, six months in 2009 with a Walmart, two months of warehouse work, and an ultimately unsuccessful effort to join the military in 2010. PSR ¶¶ 79, 81-83. These encompass about 12 months of the 20 Mr. Spain has been at liberty since June 2010. *See* PSR ¶¶ 45, 48 (noting release from DOC on July 31, 2008, release from supervised probation in November 2009, and June 2010 charge leading to last conviction). He has 32 years of suspended time over his head from his 2010 conviction, and 9 years from his 2005 conviction, both of which have generated a capias for having violated terms of good behavior. *See* PSR ¶¶ 44, 48.

### *Discussion and Analysis*

It does not ignore the 800 pound gorilla in the room---evidence reflecting Mr. Spain's interest in the activities of the designated foreign terrorist organization ISIS---to say that ape does not and should not occupy the entire sentencing conversation. That conversation should consider at least the following:

***This case is a felon in possession of firearm case, not a terrorism case.*** The United States is hardly shy about indicting material support cases. This Court has seen some. This is not one. It is a felon in possession of firearm case, one with an agreed presentence report that does *not* apply a terrorism enhancement, *see* USSG § 3A1.4, and that does apply an enhancement

---

[2] Upon investigation, an employee at J. Sergeant Reynolds Community College verified that Mr. Spain applied for and attended classes in the summer of 2009, but was dropped for missing too many classes. He also reapplied online last summer to take courses in the spring 2018 semester, but apparently had not yet been enrolled in classes. *See* Exh. 1 hereto.

for "altered or obliterated serial number," which is arguably wrong as a matter of law and at least questionable as a matter of policy, *see* contemporaneously filed objection.

The felon in this case was effectively surveilled by the FBI in multiple ways for *years* by paid or other informants in prison, plus continuing contact with the defendant after his discharge that was so close as to make almost irrelevant the defendant's compliance with GPS monitoring as required by his state supervision. *See* PSR ¶¶ 8-11, 48, and accompanying notes.

The felon in this case reportedly spoke extensively about obtaining a firearm, but it was always "specifically a handgun," not some weapon of mass destruction. *See* PSR ¶ 13.

Rather than let Mr. Spain act outside their surveillance to acquire a weapon, federal agents used a "confidential human source" who dealt with him after he was released from state custody, to talk him into taking a handgun from him. Mr. Spain never asked for any particular weapon or any particular characteristic. The ensuing controlled delivery was of a 9mm Glock Model 26 from FBI inventory. The serial number plate was removed from the weapon, (generating a 4-level enhancement in Guideline offense level), and a magazine was provided that is capable of accepting up to 17 rounds (generating a 2-level enhancement). Promptly after Mr. Spain retrieved the weapon from what he thought was his trusted confidant, he was surrounded by authorities, and taken into custody after a brief attempt to flee. PSR p. 4

That's what this case is.

### *This is a defendant subject to much greater punishments*

Mr. Spain has 41 years hanging over his head in Henrico County. That is more than four times the maximum penalty he can receive from this Court. Even if he gets "only" 10 years of that, the additional time is relevant to sentencing considerations, including punishment,

deterrence, safety of the community, and respect for the law.  It gives this Court less incentive to impose a sentence above advisory Guidelines to effect those considerations.

### *Mr. Spain is a product of circumstances more controlled by government and others*

If prosecutors are right that ISIS hysteria should drive this sentencing train, that invites legitimate questions about why the domestic battle against ISIS did nothing to combat whatever impact they claim ISIS has had on Mr. Spain.

That young people essentially terrorized by their own parents turn to crime is relatively predictable.  That juvenile and adult correctional facilities are breeding grounds for gang recruitment or radicalization seem old hat, as well, and not merely reflected by this defendant's own sad history.  *See, e.g.,* 2013 National Gang Report 4, 7, 15, 17 (noting protection offered by prison gang affiliation as inducement); Mark S. Hamm, Ph.D., Prisoner Radicalization: Assessing the Threat in U.S. Correctional Institutions (October 2008) (noting radicalization in prison is linked to prison gangs) (available at https://www.nij.gov/journals/261/pages/prisoner-radicalization.aspx).

From the record made in the PSR, Mr. Spain was followed and monitored for years in custody, then monitored even more closely upon release, before his ambiguous statements about obtaining a firearm prompted authorities to set him up to purchase one.  But there is no evidence that anybody identified inmate leaders who worked on Mr. Spain's sense of isolation and need for protection for years, whether in Beaumont or DOC.  Ironic, since "inmate leadership is the most important factor in prisoner radicalization."  Hamm, *supra*.

Lest this argument be misconstrued as a blame game, it is not.  To be explicit, counsel offers a simple proposition not contingent on blame.  The proposition is this:  if we know prisons are breeding grounds for gang recruitment or radicalization, and if we are unwilling or unable to

7

do something to limit that, then putting Mr. Spain back into those breeding grounds for a long time is counterproductive, both generally and in terms of most statutory sentencing factors save punishment and protection. It runs the real risk of exacerbating the problem, and making it even more difficult for Mr. Spain to acquire the skills of daily living in the real world to which he will eventually be released.

### Mr. Spain took steps on his last release inconsistent with an inevitable terrorist act

According to Hamm, *supra*, "only a very small percentage of converts turn radical beliefs into terrorist action." Mr. Spain himself indicated during his presentence interview his desire for a "second chance." His sister noticed him obtaining employment, applying to take college courses (corroborated by investigation), and looking to start paying child support, which was ordered while he was serving his last prison stint.

In sum, statutory sentencing factors are sufficiently addressed by a sentence of not more than 57 months. Mr. Spain faces consequences in terms of prison treatment, additional time from state courts, and return to the environment that bred him, which make whatever sentence this Court imposes just a fraction of the punishment, deterrence, and incapacitation of him that are the focus of federal statutory sentencing principles. *See* 18 U.S.C. § 3553(a)(2)(A) through (C). Added prison time may even contradict the deterrence goal of federal sentencing, and sentencing Spain as if he has committed a terrorism crime which he has not, is equally inconsistent with the continuing statutory counsel to avoid unwanted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). A 57 month sentence is sufficient.

Respectfully submitted,
CASEY CHARLES SPAIN

By: _____s/_____
        Counsel

8

Paul G. Gill
Va. Bar # 31461
Counsel for the Defendant
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
Ph. (804) 565-0870
Fax (804) 648-5033
Email: paul_gill@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:  Brian Hood (Brian.Hood@usdoj.gov), and Raj Parekh (Raj.Parekh@usdoj.gov).

By: _____s/_____
                    Counsel

Paul G. Gill
Va. Bar # 31461
Counsel for the Defendant
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
Ph. (804) 565-0870
Fax (804) 648-5033
Email: paul_gill@fd.org

9